# Illinois Official Reports

## Appellate Court

---

### *People v. Alexander*, 2017 IL App (1st) 142170

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KORY ALEXANDER, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-2170 |
| Filed<br>Rehearing denied | June 5, 2017<br>July 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-2253; the Hon. Paula M. Daleo, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Barney & Hourihane, LLP, of Winnetka (Ian M. Barney and Justice Hourihane, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Margaret G. Lustig, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Connors and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1     The defendant-appellant, Kory Alexander, was found guilty by a jury of first degree murder. However, in a special interrogatory, the jury found that it had not been proven that defendant discharged a firearm during the commission of the offense. The trial court sentenced defendant to 40 years in prison on the first degree murder conviction.

¶ 2     Defendant raises several issues on appeal. Defendant argues (1) his first degree murder conviction should be set aside because of the jury's finding on the special interrogatory, (2) he was denied his right to a fair trial where the jury instructions implied that he could be guilty under a theory of accountability even though no accountability instruction was given, (3) the trial court committed reversible error when it refused to give defendant's "mere presence" jury instruction, and (4) the trial court committed reversible error when it instructed the jury on motive without first consulting the parties.

¶ 3     Based on the record before this court, we affirm defendant's conviction for first degree murder and find no errors regarding the trial court's handling of the jury instructions or the jury's question.

¶ 4                                    JURISDICTION

¶ 5     On March 7, 2014, a jury found defendant guilty of first degree murder. On April 1, 2014, he filed a motion for judgment of acquittal or, in the alternative, a new trial. On June 6, 2014, the trial court denied defendant's posttrial motion and sentenced him to consecutive terms of 40 years' imprisonment. Defendant timely filed his notice of appeal on the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                    BACKGROUND

¶ 7     Around midnight on November 22, 2011, the victim, Darion Mason, prepared to take his mother, Denise Mason, to her work. As the pair walked to the victim's car, Denise realized she forgot her earrings. She ran back into the house to retrieve the earrings, and the victim kept walking to his car. After retrieving the earrings, Denise was approaching the victim's car when she observed the silhouettes of her son in the driver's seat and an unknown person in the backseat. As she opened the door, shots rang out, and Denise realized someone was shooting her son. She heard two gun shots and screamed "[H]elp my son, he's shooting my son." The police arrived and arrested defendant not far from the scene of the shooting. On December 22, 2011, the defendant was charged with six counts of first degree murder, two counts of unlawful use of a weapon by a felon, and four counts of aggravated unlawful use of a weapon.

¶ 8     At trial, the State called several responding police officers to testify as to the night's events. Bellwood police officer Eddie Morales testified that on November 22, 2011, at approximately midnight, he was on patrol when he heard two or three gunshots. The gunshots were coming from south of where he was located. In response, he turned off his headlights to conceal his vehicle and proceeded to the intersection of Bellwood Avenue and

Jackson Street, which was approximately 100 feet away from him. Within seconds of arriving at the intersection, he noticed an individual in all black clothing wearing a dark hooded sweatshirt running northbound (toward the officer) on the eastside of Bellwood Avenue. Officer Morales was approximately 50 to 70 feet away and did not see anyone else at that time. It appeared to the officer that the person had something in his right hand. While the individual was still some distance from Officer Morales, he exited his vehicle and demanded the individual stop.

¶ 9    The person did not respond and proceeded to turn eastbound on Jackson Street toward an alley. The person turned southbound into the mouth of the east alley on the 1000 block of Bellwood Avenue. Officer Morales drove his vehicle up to Van Buren Street and made a left-hand turn in an effort to continue to pursue this individual. He continued eastbound on Van Buren Street and then parked at the mouth of the alley. He then traveled on foot eastbound on Van Buren Street to Bohland Avenue, which is one block east of Bellwood Avenue. After losing track of the individual, Officer Morales saw the individual crossing Bohland Avenue. He continued eastbound until he saw a person cross over the alley. This individual was physically consistent with the person he had seen crossing Bohland Avenue. At some point, Officer Morales met up with other officers on the 1000 block of Linden Avenue where they detained an individual near the school on that block. In court, Officer Morales identified the defendant as the individual being detained. Approximately five to seven minutes passed between the time when Officer Morales initially heard the shots and the time that defendant was in custody. During that time, the officer had seen a car drive the wrong way down Jackson Street but could not identify it.

¶ 10   Officer Morales retraced the subject's steps back to where he initially saw the person and, in doing so, discovered several items. He found a black hooded sweatshirt and two gloves on the 1000 block of Bohland Avenue in the general area where he saw the person running. In the rear of that residence, he found a black, semiautomatic handgun laying in the yard.

¶ 11   Bellwood police officer Scott Guliano testified that he heard a radio call from Officer Morales. Officer Morales made a request for additional units, and Officer Guliano responded immediately. In his marked car, he activated his emergency lights and sirens while traveling at a high rate of speed toward the area. He parked his vehicle in an alley just before Linden Avenue and just off Jackson Street. He exited his car and began searching for the suspect. At this point, he was joined by Officer Kevin Barnett, and the two proceeded to walk down Linden Avenue. As they exited a gangway approximately three houses in on Linden Avenue, Officer Guliano saw a black male with a black T-shirt and black jeans exiting a gangway. The officer's yelled, "Stop" and "Police." The black male then ran across the street. Officer Guliano identified the individual as defendant, Kory Alexander. Defendant was alone that night, and it was only 35 to 38 degrees outside. The officers gave chase and eventually tackled the defendant near an elementary school.

¶ 12   Monica Hemingway testified that she was parked in front of her house on Linden Avenue near Jackson Street with her boyfriend in the early morning hours of November 22, 2011. The two were parked on the west side of the street. An elementary school is on the east side of the street. While in the car, she noticed police officers at different locations on the block. Monica then noticed an individual who was peeking out from a walkway on the side of her house. She described the individual as African-American but could not see any other features. She could not see his face. She contacted the police because she believed this

person was trying to conceal himself. The individual then began walking slowly south on Linden Avenue. The police saw him and told him to stop. In response to the police's shouts, Monica saw the individual run but he was caught by police. She did not see anyone else out that night.

¶ 13    Officer Kevin Barnett testified that he was an officer with the Village of Bellwood and was on routine patrol on the midnight shift the night of the victim's death. In response to a radio distress call, he traveled to the intersection of Jackson Street and Linden Avenue in Bellwood. Upon arriving, he made contact with Officer Guliano. While the two were walking, Officer Barnett saw an individual run out from a gangway. They gave chase and eventually detained the individual. Prior to coming into contact with Officer Guliano, Officer Barnett saw a man in a yellow jacket exiting an apartment building on Linden Avenue. The officer never obtained any information from the individual because the man was obese and did not match the description of the individual for whom they were looking.

¶ 14    Officer Shawn Clark was employed with the Village of Bellwood and was working the midnight shift on November 22, 2011, when he received Officer Morales's radio call. Officer Clark traveled to the scene of the shooting. Upon arrival, he observed a Jeep with an open driver's door and the victim in the driver's seat, feet on the ground, head back, and unresponsive.

¶ 15    Hillside police corporal Michael Duffek testified he was on routine patrol on November 22 when he responded to the Bellwood police's call for assistance. Corporal Duffek was on Linden Avenue when he observed the defendant run across Linden Avenue while being chased by other officers. He observed officers tackle defendant in the grassy area near the school on Linden Avenue.

¶ 16    Master Sergeant Jack Bridson testified that he was employed by Bellwood police as a master sergeant in investigations and was called to the scene. He initially examined the scene where the victim was shot and located three spent shell casings. He then relocated to 3608 Jackson Street where additional evidence was located. He collected a hooded sweatshirt, a leather glove, and a brown glove near the sweatshirt, which were admitted into evidence. He also recovered a Hi-Point .40-caliber handgun, which was admitted into evidence.

¶ 17    Detective Randy Bucker was a detective with the Bellwood Police Department and was on-call when he received an assignment regarding the shooting. He administered a gunshot residue test and a buccal swab of defendant. He identified the shirt and jeans, which were taken off of defendant the morning he was arrested.

¶ 18    Dr. James Filkins testified that he performed the autopsy on the victim. The victim had two gunshot wounds to the left side of his head. The first bullet entered the skull and traveled through the brainstem causing death. The second gunshot entered the scalp; it traveled around the head between the scalp and the skull before exiting the back of the head. He could not determine how close the gun was to the victim's head when it was fired.

¶ 19    Dr. Mary Wong, a forensic scientist employed by the Illinois State Police, testified that she was asked to perform gunshot residue tests on various items recovered by the police. She tested the exterior of the two gloves, the exterior of both sleeves of the hooded sweatshirt, and defendant's pants for gunshot residue. Samples were also taken of defendant's hands to analyze for residue. The tests from defendant's hands were negative, as were the tests done on the hooded sweatshirt. The test on the leather glove was negative, while the test on the brown glove was positive.

¶ 20    Tonia Brubaker, a firearm examiner with the Illinois State Police, examined the Hi-Point handgun recovered from between the two houses near where the defendant was arrested. She also examined the bullets recovered from the victim's body. She concluded that shell casings recovered from the scene along with one of the bullets from the victim's body were fired from the recovered gun.

¶ 21    Eleanor Giacometti, a forensic scientist with the Illinois State Police, examined the firearm for latent fingerprints. She found one latent print located underneath the plastic grip on the handgun. She had to unscrew the grip to see the print and could not determine how long it had been there. It did not match the defendant.

¶ 22    Karina Gomez, another forensic scientist for the Illinois State Police, performed DNA testing. She analyzed DNA samples from the hooded sweatshirt and the gloves and compared them to the DNA of the defendant and the victim. The sample from the sweatshirt revealed a mixture of at least three people. She was able to extract a major human DNA profile and a minor human DNA profile. A major DNA profile occurs where one person deposits more DNA than another and a minor profile is essentially less DNA than what has been contributed by the major profile. The major DNA profile did not match either the defendant's or victim's DNA. Gomez ran the major profile through a DNA database of convicted offenders, missing persons, relatives of missing persons, unidentified remains, and Illinois State Police staff members, which revealed an association between the major profile and a profile in the database, one Stanley Street. As to the minor DNA profile, Gomez determined that the defendant could not be excluded from having contributed to the profile.

¶ 23    Gomez was also able to recover DNA samples from both gloves. As to the brown glove, the sample contained a mixture of DNA profiles (though no major or minor ones) from which defendant could not be excluded. However, the victim was excluded. As to the sample from the leather glove, she was able to extract a major human profile from which defendant could not be excluded.

¶ 24    The defense sought to reveal the identity of the person to whom the major DNA profile on the hooded sweatshirt matched: Stanley Street. The court ruled that there was no confirmatory testing done to determine if the DNA was actually that of Stanley Street and therefore the defendant could not reveal the identity of the matching profile to the jury. As an offer of proof, the defendant questioned Gomez about the fact the major profile found on the hooded sweatshirt was run through a database and a match was made, but the match could not be confirmed.

¶ 25    Defendant did not present evidence, testimonial or otherwise.

¶ 26    At the jury instruction conference, the defense sought to include a non-Illinois Pattern "mere presence" Jury Instruction. The court denied this request noting that evidence did not support the presence of any other individual at the scene.

¶ 27    Following closing arguments, the jury was given two verdict forms on first degree murder and two verdict forms regarding the special interrogatory for purposes of the firearm sentencing enhancement. After instructing the jury on the law, while the jury exited to begin deliberations, a juror asked the court if she could ask a question. The following exchange occurred:

> "JUROR: We have a question.
> THE COURT: Of whom?

JUROR: Why we can't [*sic*] hear any motive in this case?

THE COURT: You heard the State does not have to prove motive in this case."

This question was asked and answered in open court with all parties present. The court did not discuss its answer with either party prior to its pronouncement. After the jury retired, defense counsel objected to the court's communication with the jury and the substance of the response. Defense counsel argued that its position was that the response to the question should have been that the jury had the instructions and the evidence and they should continue to deliberate. The objection was overruled.

¶ 28 The jury returned a verdict of guilty on the first degree murder charge. In addition, the jury found that the allegation was not proven that during the commission of the offense of first degree murder, defendant personally discharged a firearm that proximately caused the death of the victim. Defendant filed a motion for a new trial, arguing that the jury's verdict was inconsistent based on the finding in the special interrogatory. The motion also argued that the juror's motive question was improperly answered by the trial court. The trial court denied both motions. Defendant was sentenced to 40 years in the Illinois Department of Corrections on the first degree murder conviction.

¶ 29 Defendant timely filed his notice of appeal.

¶ 30 ANALYSIS

¶ 31 Defendant raises several issues on appeal: (1) his first degree murder conviction should be set aside because of the jury's finding on the special interrogatory, (2) he was denied his right to a fair trial where the jury instructions implied that he could be guilty under a theory of accountability even though no accountability instruction was given, (3) the trial court committed reversible error when it refused to give defendant's "mere presence" instruction, and (4) the trial court committed reversible error when it instructed the jury on motive without first consulting the parties.

¶ 32 In his first issue, defendant claims his first degree murder conviction must be vacated because the jury found the State failed to prove defendant personally discharged a firearm during the commission of the offense of first degree murder. When the trial court gave the jury the law and jury instructions, the jury was provided with a special interrogatory that asked whether the State had proven beyond a reasonable doubt that defendant personally discharged a firearm during the commission of the charged offense of first degree murder. While the jury returned a guilty verdict on the first degree murder charge, they also answered the special interrogatory in the negative.

¶ 33 Before this court, defendant argues that committing murder by personally discharging a firearm is an aggravated form of murder that the State must prove in total. He thus concludes that the State's failure to prove the personal discharge element requires reversal of his murder conviction. Defendant suggests the applicable standard of review is the same as if he were challenging his conviction based on the sufficiency of the evidence. *People v. Wheeler*, 226 Ill. 2d 92, 113 (2007). However, defendant is not challenging the sufficiency of the evidence used to convict him and instead seeks to use the inconsistent special interrogatory finding to attack the guilty verdict. We believe this issue presents a pure question of law, thus our review is *de novo*. *People ex rel. Glasgow v. Carlson*, 2016 IL 120544, ¶ 16.

¶ 34    In arguing that his first degree murder conviction must be vacated, defendant relies on *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013) (plurality op.). In *Alleyne*, the defendant was charged with multiple felonies including robbery affecting interstate commerce (18 U.S.C. § 1951(a) (2006)) and using or carrying a firearm in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) (2006)). *Alleyne*, 570 U.S. at ___, 133 S. Ct. at 2155. Section 924(c)(1)(A) provided for different terms of imprisonment depending on the factual circumstances: (i) imprisonment of not less than five years, (ii) not less than seven years if the firearm is brandished, and (iii) not less than 10 years if the firearm is discharged. *Id.* at ___, 133 S. Ct. at 2155-56. In convicting the defendant, the jury found that defendant "[u]sed or carried a firearm" but did not indicate a finding that the firearm was "[b]randished." (Internal quotation marks omitted.) *Id.* at ___, 133 S. Ct. at 2156. The sentencing report recommended a seven-year sentence, reflecting a mandatory minimum sentence in cases involving "brandishing." *Id.* at ___, 133 S. Ct. at 2156. In overruling defendant's objection and sentencing him to seven years, the trial court explained "brandishing [is] a sentencing factor that the court could find by a preponderance of evidence without running afoul of the Constitution." *Id.* at ___, 133 S. Ct. at 2156.

¶ 35    In an opinion written by Justice Thomas, the Supreme Court disagreed "[b]ecause the finding of brandishing increased the penalty to which the defendant was subjected, it was an element, which had to be found by the jury beyond a reasonable doubt." *Id.* at ___, 133 S. Ct. at 2163. In reaching this conclusion, the Court looked to its recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Court held that facts exposing a defendant to a greater punishment than otherwise legally prescribed are by definition elements of the offense and must be submitted to the jury. *Apprendi*, 530 U.S. at 483 n.10. Relying on *Apprendi*, the *Alleyne* Court concluded that "because the legally prescribed range *is* the penalty affixed to the crime, *** it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense." (Emphasis in original.) *Alleyne*, 570 U.S. at ___, 133 S. Ct. at 2160. The *Alleyne* Court concluded the trial court improperly sentenced defendant because the "brandishing" element had not been found by jury. *Id.* at ___, 133 S. Ct. at 2163-64.

¶ 36    In further support of his position that committing murder by personally discharging a firearm represents an aggravated form of murder, defendant cites to *People v. Peoples*, 2015 IL App (1st) 121717. The facts of *Peoples* resemble the facts of our case in that the defendant in *Peoples* was convicted of first degree murder but not the firearm enhancement. *Id.* ¶ 55. The *Peoples* court reversed and remanded the murder conviction because the jury was improperly instructed on the theory of accountability. In *dicta*, the court stated it saw "no meaningful difference in the language constituting the offense of first-degree murder and the enhancement language," and that "[i]t [was] impossible to reconcile the jury's finding that defendant 'perform[ed] the acts which cause[d] death' to [the victim] with its finding that defendant did *not* 'personally discharge[ ] a firearm that proximately caused [the] death' " of the victim. (Emphasis in original.) *Id.* ¶ 102. Despite this recognition, the *Peoples* court conceded such an outcome did not entitle defendant to reversal of his murder conviction even taking into consideration the accountability error. *Id.* ¶ 103.

¶ 37    Defendant argues, pursuant to *Alleyne*, personal discharge of a firearm is an element of a new offense of aggravated first degree murder and, pursuant to *Peoples*, it would be

nonsensical and unfair to allow him to be convicted as the principal shooter in a murder but found not to have personally discharged said firearm.

¶ 38    While it may seem nonsensical to allow the above situation to occur, both the Illinois Supreme Court and the United States Supreme Court have stated that such an occurrence does not offend the constitution and such convictions can stand. In our supreme court's decision of *People v. Jones*, 207 Ill. 2d 122 (2003), it adopted the rule that convictions cannot be challenged because they are inconsistent with acquittals on other charges. In *Jones*, our supreme court adopted the rule enunciated by the United States Supreme Court in *United States v. Powell*, 469 U.S. 57 (1984), that the United States Constitution does not require consistency in criminal verdicts. *Jones*, 207 Ill. 2d at 133-34. In adopting *Powell*, the *Jones* court stated, "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *Id.* While defendant seeks to frame the issue in a different light, his argument is based exclusively on using the inconsistent special interrogatory to challenge the guilty verdict on the first degree murder charge. We adhere to our supreme court's decision in *Jones* that a defendant cannot "challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *Id.*

¶ 39    Even if defendant's challenge was not foreclosed by *Jones*, his reliance on *Alleyne* and *Peoples* is misplaced. *Alleyne* does not support defendant's position. That case stands for the proposition that any fact which raises the sentencing floor must be proven beyond a reasonable doubt. *Alleyne*, 570 U.S. at ___, 133 S. Ct. at 2160. The case does not address inconsistent verdicts or the *Powell* decision. Moreover, despite defendant's argument to the contrary, *Alleyne* and *Peoples* do not call for the conclusion that murder by personal discharge of a firearm is a separate, aggravated offense of first degree murder, which requires the State to prove personal discharge of a firearm in order to sustain the murder conviction itself.

¶ 40    After discussing the "diametrically opposed" verdicts, the court in *Peoples* recognized that such an inconsistency does not mandate outright reversal of the murder conviction. *Peoples*, 2015 IL App (1st) 121717, ¶¶ 102-03 (citing *People v. Reed*, 396 Ill. App. 3d 636, 646-47 (2009) (guilty verdict on first degree murder and acquittal on firearm enhancement did not mandate reversal of conviction)). The court further acknowledged that even with the incorrect instruction on accountability, defendant would still not be entitled to outright reversal of his murder conviction because a court "may not guess as to why a jury did what it did." *Id.* ¶ 106 (citing *People v. Spears*, 112 Ill. 2d 396, 409 (1986)). We also disagree with the *dicta* in *Peoples* that there is no meaningful difference between the offense of first degree murder and the firearm enhancement. *Id.* ¶ 102. Illinois courts have previously stated that even when a victim is killed via a gunshot, proving the defendant used a firearm is not required to sustain a murder conviction.

¶ 41    In both *People v. Sharpe*, 216 Ill. 2d 481 (2005), and *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522 (2003), Illinois courts recognized that even when the victim is killed via a gunshot, the crime of first degree murder and the firearm enhancement contain separate elements. In *Sharpe*, the defendant contended that the crime of first degree murder contained identical elements to the firearm enhancement charge. 216 Ill. 2d at 526. In rejecting this argument the court stated, "[e]ven a casual consideration of the issue reveals that for the

- 8 -

[firearm] enhancement to apply, there are indeed additional facts which must be proven: that the perpetrator personally discharged a firearm during the commission of the offense." *Id.*

¶ 42    The court in *Sawczenko-Dub* made this point even clearer. In that case, the defendant argued that the firearm enhancement violated double jeopardy because "she was placed in jeopardy for first degree murder, which depended upon her discharging a firearm, and then the same factor, discharge of a firearm, subjected her to additional penalties." 345 Ill. App. 3d at 535. In rejecting her contention that she was being punished more than once for the same offense, the court stated, "[i]t was irrelevant whether she used a firearm in committing the murder or not. *** [The murder] sentence did not punish her for use of a firearm. Again, she was punished for killing her husband, *however that may have occurred*." (Emphasis added.) *Id.* Thus, *Sawczenko-Dub* and *Sharpe* demonstrate that in regard to a first degree murder charge, the State is not required to prove beyond a reasonable doubt that the defendant used a firearm, even when the victim dies from a gunshot.

¶ 43    This is further reinforced by the pattern jury instructions used in this case. The trial court provided the jury with the following instructions regarding the charge of first degree:

> "To sustain the charge of first degree murder, the State must prove the following propositions;
>
> *First*: That the defendant performed the acts which caused the death of Darion Mason; and
>
> *Second*: That when the defendant did so, he intended to kill or do great bodily harm to Darion Mason; or
>
> He knew his acts would cause death to Darion Mason; or
>
> He knew that his acts created a strong probability of death or great bodily harm to Darion Mason.
>
> If you find from your considerations of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your considerations of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The jury was also provided the following instruction regarding the firearm enhancement:

> "The State has also alleged that during the commission of the offense of first degree murder that the defendant personally discharged a firearm that proximately caused death to another person.
>
> If you find the defendant is not guilty of the offense of first degree murder, you should not consider the State's additional allegation regarding the offense of first degree murder.
>
> If you find that the defendant is guilty of first degree murder, you should then go on with your deliberation to decide whether the State has proved beyond a reasonable doubt the allegation that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person.
>
> Accordingly you will be provided with two verdict forms as to the allegation: 'We the jury find the allegation was not proven that during the commission of the offense

of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person' and, 'We the jury find the allegation was proven that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person.'

From these two (2) verdict forms, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other verdict form. Sign only one of the verdict forms.

Your agreement on your verdict as to the allegation must be unanimous. Your verdict must be in writing and signed by all of you, including the foreperson."

In comparing the two instructions, the distinction becomes obvious. The jury instruction on first degree murder does not mention the use of firearm. As the *Sawczenko-Dub* court explained, "[the defendant's] use of the firearm was not a crime in and of itself. The crime was the extinction of a human life…. The gun was simply the method selected by [the defendant] to accomplish the crime, and the particular method selected subjects [him] to an additional penalty." (Internal quotation marks omitted.) 345 Ill. App. 3d at 536 (quoting *People v. Hutchins*, 109 Cal. Rptr. 2d 643, 647 (Ct. App. 2001)). As stated in the jury instructions and explained by the court's in *Sawczenko-Dub* and *Sharpe*, personal discharge of a firearm is not an element of first degree murder even when the victim dies from a gunshot.

¶ 44    Based on the above, even if defendant's claim was not barred by *Jones*, his argument still fails because the State did not have to prove defendant personally discharged a firearm causing the death of the victim in order to obtain a first degree murder conviction. Accordingly, the jury's finding on the special interrogatory does not necessitate the vacatur of his first degree murder conviction. We therefore affirm the first degree murder conviction.

¶ 45    Defendant next contends that he was denied his right to a fair trial when the jury was implicitly instructed that it could convict based on a theory of accountability. Defendant acknowledges he is raising this issue for the first time on appeal and asks us to consider the issue under the plain-error doctrine.

¶ 46    When an error is alleged for the first time on direct appeal, the appellate court will review the issue if the record reflects "plain error." *People v. Laugharn*, 297 Ill. App. 3d 807, 811-12 (1998). However, the plain error doctrine is not a "general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court." (Internal quotation marks omitted.) *People v. Herron*, 215 Ill. 2d 167, 177 (2005). Plain error occurs where there is an error in the record and (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *Id.* at 186-87. The first step in the plain error analysis is to determine whether error occurred at all. *People v. Harris*, 225 Ill. 2d 1, 31 (2007). Where no error occurred at all, there can be no plain error. *People v. Sims*, 192 Ill. 2d 592, 621 (2000).

¶ 47    After a review of the record, we find no error and reject defendant's contention that the jury was implicitly instructed on a theory of accountability. Defendant argues "parsing the element of personal discharge of a firearm from the remaining elements of murder in the jury instructions conveyed to the jury that defendant could be held criminally responsible for murder even if he did not fire the shots that killed the victim." As we have stated above, personal discharge of a firearm is not an element needed to convict defendant of first degree murder. However, pursuant to *Apprendi* and *Alleyne*, it was a fact that needed to be submitted

to the jury in order for the State to seek the firearm enhancement sentence. *Apprendi*, 530 U.S. at 483; *Alleyne*, 570 U.S. at ___, 133 S. Ct. at 2155. There was no error in these instructions, and we reject defendant's contention that the jury was implicitly instructed on a theory of accountability.

¶ 48    The defendant also argues that the trial court erred when it failed to tender defendant's "mere presence" instruction to the jury. The "mere presence" instruction was not an Illinois Pattern Jury Instruction (IPI) but was a version of the Seventh Circuit Court of Appeals pattern criminal jury instructions. The instruction proposed the following: "A defendant's presence at the scene of the crime and knowledge that a crime is being committed is not sufficient by itself to establish defendant's guilt." After hearing arguments on the instruction, the trial court rejected its use. On appeal, he argues the instruction should have been given because there was sufficient evidence to support the instruction, the jury was not instructed on accountability, and the instructions, as structured, indicated to the jury that defendant could be held responsible even if he did not personally discharge the firearm.[1]

¶ 49    "Jury instructions are necessary to provide the jury with the legal principles applicable to the evidence presented so that it may reach a correct verdict." *People v. Falco*, 2014 IL App (1st) 111797, ¶ 15. Illinois Supreme Court Rule 451(a) provides that whenever the IPI "contains an applicable jury instruction and the court determines that the jury should be instructed on the subject, the [IPI instruction] shall be used, unless the court determines that it does not accurately state the law." (Internal quotation marks omitted.) *Id.* (quoting Ill. S. Ct. R. 451(a) (eff. July 1, 2006)). Where no IPI exists on a subject, the court has the discretion to give a nonpattern jury instruction. *People v. Ramey*, 151 Ill. 2d 498, 536 (1992).

¶ 50    Appellate courts will defer to the trial court's decision as to whether sufficient evidence supports a particular jury instruction. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). While a trial court enjoys discretion in deciding whether to give a jury instruction, the court will have erred in not giving the instruction if the failure to give the instruction was an abuse of discretion. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 77. An abuse of discretion occurs where there is some evidence to support giving the instruction but the court fails to give it. *Id.* A reviewing court will not reweigh the evidence in determining whether an instruction was proper on a certain theory. *People v. Crane*, 145 Ill. 2d 520, 526 (1991).

¶ 51    After review, we find no abuse of discretion on the part of the trial court in refusing to tender defendant's "mere presence" instruction to the jury. The victim's mother testified that even though she could not see clearly, she only saw two people: her son and an unknown individual. Additionally, another witness identified defendant as the only person leaving the scene and attempting to avoid being seen. The DNA evidence does not support the conclusion that another person was present. DNA on the sweatshirt would indicate that someone else other than defendant had worn it, not that some else was physically present at the scene. A lack of motive on the part of the defendant also does not lead to the conclusion that another individual was at the scene. Based on the above, the trial court did not abuse its discretion in refusing to tender defendant's "mere presence" jury instruction.

---

[1]We rejected the last part of this argument in defendant's second issue. *Supra* ¶¶ 45-47.

¶ 52    Lastly, defendant argues that the trial court erred when it instructed the jury regarding motive.[2] After providing the jury with its instructions, the following exchange occurred in open court and in the presence of both parties:

> "JUROR: We have a question.
> THE COURT: Of whom?
> JUROR: Why we can't [*sic*] hear any motive in this case?
> THE COURT: You heard that the State does not have to prove motive in this case."

After the jury was dismissed, defense counsel objected to the court's communication with the jury and the substance of the response. Defense counsel argued the court should have told the jury it had the instruction and they should continue to deliberate. The trial court overruled the objection. Where the defendant has made a timely objection and properly preserved the issue for review, the reviewing court conducts a harmless error analysis in which the State has the burden of persuasion with respect to prejudice. *Herron*, 215 Ill. 2d at 181. Our supreme court has held that the defendant will not be entitled to a new trial as a result of the error unless the defendant had suffered actual prejudice. *People v. Childs*, 159 Ill. 2d 217, 227-35 (1994).

¶ 53    Relying on *People v. Childs*, defendant argues that in answering the juror's question without the parties input, he was denied the right to participate in a part of the proceedings substantially affecting his rights. *Id.* at 227. However, defendant's reliance on *Childs* is misplaced. In *Childs*, the judge answered the jury's question while at dinner with the assistant State's Attorneys in the case and outside the presence of the defendant or his counsel, *i.e.*, an *ex parte* communication. *Id.* at 225. On review, our supreme court stated, "[a] communication between the judge and the jury after the jury has retired to deliberate, *except one held in open court and in defendant's presence*, deprives defendant of those fundamental rights." (Emphasis added.) *Id.* at 227. The court continued that the rule "has judicially evolved that a jury verdict will not be set aside where it is apparent that no injury or prejudice resulted from a communication to the jury either by the trial court or a third person *outside the presence of the defendant and his counsel*." (Emphasis added.) *Id.* at 227-28.

¶ 54    Defendant was not deprived of the right to appear and participate, whereas here, defendant admits both he and his counsel were present when the question was asked and remained silent while the court answered. The court in *Childs* and the rule discussed involved an *ex parte* communication outside of the defendant's presence, which did not occur here. Defendant cites to no other case law in support of his argument. Because the exchange occurred in the presence of both defendant and his counsel, defendant not was deprived of his right to participate in the proceedings. Accordingly, the defendant was not prejudiced and the trial court did not commit reversible error when it answered the jury's question.

¶ 55                                CONCLUSION

¶ 56    For the foregoing reasons, we affirm defendant's conviction for first degree murder and all other issues he raises.

---

[2]No written instruction on motive was provided to the jury, and defendant's argument rests solely on the exchange between the juror and the trial court.

¶ 57    Affirmed.