2021 IL App (1st) 181957-U

FOURTH DIVISION
March 25, 2021

No. 1-18-1957

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 21251 (02) |
| TIMOTHY BRUNSON, | ) ) | |
| Defendant-Appellant. | ) ) ) ) ) | Honorable Allen F. Murphy, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justice Martin concurred in the judgment.
Presiding Justice Gordon specially concurred.

**ORDER**

¶ 1   *Held*:   Affirming the judgment of the circuit court of Cook County as to defendant's murder charge where the trial court did not err when it declined to instruct the jury on a lesser included offense. Reversing the judgment of the circuit court of Cook County where the State failed to prove the *corpus delicti* that defendant personally discharged a firearm and vacating the corresponding mandatory 20-year sentence.

¶ 2   Following a jury trial, defendant Timothy Brunson, who was 19 years old at the time of

the offense, was convicted of first degree murder under an accountability theory. The jury also specially found him to have personally discharged a firearm in the commission of the offense. The trial court sentenced defendant to the minimum 20 years' imprisonment for murder plus a mandatory 20 years' imprisonment for firearm enhancement. On appeal, defendant argues (1) the trial court committed reversible error in failing to instruct the jury on the lesser included offense of aggravated discharge of a firearm, (2) the State failed to establish the *corpus delicti* that he personally discharged a firearm, and (3) his 40-year sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him. For the following reasons, we affirm the judgment of the circuit court of Cook County as to defendant's murder charge, but reverse the finding that defendant personally discharged a firearm during the commission of the offense and vacate the 20-year mandatory sentence for personal discharge of a firearm.

¶ 3                                    BACKGROUND

¶ 4     Defendant was charged by indictment in pertinent part with the first degree murder of Bryant Jones under an accountability theory. The indictment alleged that on October 21, 2012, defendant, without lawful justification, intentionally or knowingly shot and killed Bryant while armed with a firearm. The indictment further alleged that, during the commission of the offense, he personally discharged a firearm. Cecil Ross, a codefendant, was also charged with the first degree murder of Bryant.

¶ 5     The matter then proceeded to a joint bench trial where both defendant and codefendant were represented by separate counsel. After hearing all of the evidence, the trial court found defendant and codefendant guilty of first degree murder. While posttrial motions were pending, the State filed a disclosure with the court that one of its witnesses, Shaundre Pickett, had been charged with a weapons offense during the pendency of the defendant's case. The State further

asserted that the nondisclosure prior to trial was not the result of any error on behalf of the State. A new trial was ordered, and defendant and codefendant requested to be tried by separate juries.

¶ 6                                          Trial

¶ 7     The evidence at defendant's jury trial established the following facts.  On the evening of October 21, 2012, around 8:30 p.m. the victim, Bryant Jones, was with his cousins, Shaundre Pickett and Tyreece Evans, smoking marijuana on the back porch of the apartment building where Bryant resided.  While Bryant was outside, defendant, Cecil, and Sebastian Bunville entered an adjoining apartment occupied by Bryant's family member Brandon Darty, his girlfriend Carmen Gaskin, their one-month-old daughter, and Michelle Clay and her six-week-old daughter.  Earlier that evening, defendant drove Cecil and Sebastian to Michelle's apartment. They entered the apartment where Cecil looked at Michelle's sick baby.  Sebastian sat in a chair, and defendant stood by the front door.  Carmen observed Brandon going back and forth between the living room and the back porch where Bryant was smoking.  According to Shaundre, during this time Brandon was asking if he could smoke with them, but they declined his requests. Brandon then requested that Shaundre, Bryant, and Tyreece come with him into his apartment. They agreed and stood in the kitchen where they could view defendant, Cecil, and Sebastian. According to Carmen, Cecil then called her baby ugly and so she asked them to leave. Thereafter, defendant, Cecil, and Sebastian exited the apartment building and left in defendant's white Saturn Vue SUV.

¶ 8     A few minutes later Cecil called Michelle's cell phone.  Carmen testified that Michelle handed the phone to Brandon who became increasingly more agitated.  Brandon hung up the phone and informed Carmen that "they are going to kill me."  Brandon then obtained a butcher knife and went upstairs to his cousins Danyelle and Kiona Davis' apartment.  Bryant, Shaundre,

and Tyreece were already in Danyelle and Kiona's apartment. Shaundre, noticing Brandon with the butcher knife, told him to put it away and Brandon left. Shaundre, Bryant, and Tyreece then went outside. Upon exiting the apartment building they observed defendant's SUV parked in the parking lot directly adjacent to the front yard of the building with the passenger side of the vehicle closest to them. Defendant, Cecil, and Sebastian were all standing outside of the vehicle.

¶ 9   Shaundre testified that he walked to the front of the SUV while Bryant walked toward the passenger side of the vehicle. According to Shaundre, Bryant was saying that Brandon did not want to fight, and that they should go home. As Shaundre walked toward the SUV, he noticed defendant pulling up his pants like he was going to take a swing at Bryant. According to Shaundre, the sound of a handgun cocking made him look in Cecil's direction. Shaundre then observed Cecil come around the hood of the SUV, point the weapon at Bryant, and shoot. Cecil was approximately five feet away from defendant at the time. Shaundre then turned and ran into the apartment building. Shaundre did not see defendant with a weapon.

¶ 10   Carmen testified that prior to the shooting she came outside and told Cecil to leave. Cecil responded to her by saying, "you called me over here" and moved toward the driver's side of the SUV. Carmen then observed Cecil reach into the backseat and pull out a weapon. Carmen watched as Cecil discharged his weapon in Bryant's direction three or four times. According to Carmen, once Cecil commenced shooting, she turned and ran into the apartment building. She did not see defendant with a weapon.

¶ 11   No one observed defendant, Cecil or Sebastian leave the scene. Initially after the shooting, some of Bryant's family members were unable to find him. Shortly thereafter, he was discovered across the street face down in the grass. He was pronounced dead at the scene by the first responders. An autopsy revealed that Bryant sustained a gunshot wound to the shoulder.

The bullet traveled through his shoulder and entered his chest cavity where it damaged his lungs and heart, ultimately exiting out his back.

¶ 12    Crime scene investigators found Cecil's driver's license in the parking lot close to four fired 9-mm cartridge casings. One fired 9-mm bullet was also recovered. An expert in toolmark identification testified that the four fired cartridge casings and the fired bullet were each discharged from the same firearm. Shaundre and Carmen identified Cecil in separate lineups as the individual who shot Bryant. Shaundre, Carmen, and Danyelle also identified defendant as an individual who was at the scene.

¶ 13    Charles Cramer, defendant's friend, testified that at 9:45 p.m. on October 21, 2012, defendant called him and asked him if he could hide a "demo" for him. Charles testified that he did not know what a "demo" was, and defendant later sent him a text stating, "never mind." The next day at 1:30 p.m. Charles was at Prairie State College with Sebastian when defendant called Sebastian's cell phone. Sebastian handed the phone to Charles and defendant asked Charles to accompany Sebastian to a house located in Chicago Heights. Charles drove with Sebastian to meet defendant. Defendant handed Charles a 2-inch by 2-inch box wrapped in a plastic bag. Charles placed the bag in the trunk of his vehicle. Defendant then told Charles what had happened the previous evening. According to Charles, defendant told him that someone "ran up on" them and defendant shot him in the shoulder and the back. Defendant said the victim ran away and defendant "kept shooting." Defendant informed Charles that the victim was "slumped over" before he ran off.

¶ 14    Charles further testified that later that day, after receiving a phone call from his friend, Kevin Petit, Charles drove to Kevin's residence with the box still in the trunk. Once he arrived at Kevin's residence, he watched as Kevin went to the back yard, jumped the fence, and came

back with another plastic bag. They both sat down at Kevin's kitchen table, put gloves on, and opened the two bags. According to Charles, it was at this time he realized that they were handling a handgun and ammunition.

¶ 15    The next day, Charles and Kevin contacted the Blue Island Police Department and informed the police that they wanted to turn in a handgun and ammunition. They met with Blue Island police officers in a parking lot and turned over the weapon, a 9-mm Taurus semiautomatic handgun. They also turned over a dozen rounds of 9-mm ammunition from the plastic bag and 10 rounds of 9-mm ammunition that were inside the gun case. A firearm expert testified at the trial that the weapon turned over by Charles was the weapon that was used in the shooting. He also testified that the shell casings and the fired bullet were discharged from the same weapon.

¶ 16    Defendant was arrested on the afternoon of October 22, 2012. Defendant subsequently gave a videotaped statement to detectives. In the statement, defendant informed them that prior to the shooting he had purchased a 9-mm handgun and ammunition. Defendant also stated there had been bad blood between Cecil and Brandon ever since high school. According to defendant, on the day of the shooting, he, Cecil, and Sebastian drove to Michelle's apartment building with the firearm in the vehicle. Sebastian wanted to bring the firearm into the apartment, but defendant dissuaded him. Then, when they returned and parked in the parking lot, defendant was aware that Cecil had the weapon on him when he exited the SUV. Defendant stood on the driver's side of the SUV. When he heard gunshots, he ducked down. Cecil then ran by him and defendant grabbed the weapon from Cecil's hand and shot it twice down the street as Bryant ran away. Defendant further stated that after the shooting he gave Charles a box of ammunition and Kevin the weapon. The videotaped statement was admitted into evidence and published to the jury.

¶ 17    Additional physical evidence was presented at the trial including a black hooded sweatshirt recovered from Cecil's vehicle. A gunshot residue test was performed, and gunshot residue was discovered on the left cuff of the black hooded sweatshirt. A mixture of DNA from at least three different individuals from which Cecil could not be excluded was discovered on the black hooded sweatshirt. Such a match would occur in one in 19 quintillion African American individuals, one in 7.2 sextillion Southwest Hispanics, or one in 160 sextillion white unrelated individuals. Defendant, Sebastian, Charles, and Kevin were excluded from being a match to the DNA discovered on the black hooded sweatshirt. Defendant's white Saturn Vue SUV was also recovered and the items within the vehicle were inventoried. A black jacket was discovered in the cargo area of the vehicle and was also tested for gunshot residue. That test came back negative for gunshot residue. A DNA test was performed on the black jacket and it contained a mixture of at least two DNA profiles, one being Cecil's. Such a match to Cecil's DNA profile would occur in one in 150 quintillion African American individuals, one in 49 sextillion Southwest Hispanics, or one in 1.4 sextillion white unrelated individuals. Defendant, Sebastian, Charles, and Kevin were excluded from being a match to this DNA.

¶ 18    The State rested and defendant moved for a directed verdict, which was denied. The defense did not present any live testimony but did enter a stipulation that Cecil signed a consent to search form with his left hand. The defense also admitted into evidence a still image from the videotape of Cecil signing the consent to search form, which was published to the jury.

¶ 19    Outside the presence of the jury, the trial court conducted a jury instruction conference wherein defendant objected to the jury being instructed on accountability. The trial court overruled the objection. Defendant then sought to have the jury instructed on the lesser included offense of aggravated discharge of a firearm, which the trial court denied.

¶ 20	After hearing closing arguments and jury instructions, the jury commenced deliberations. Approximately 45 minutes later, the jury sent out a note stating, "Not able to agree." The trial court noted that the jury had barely begun to deliberate and directed them to continue to deliberate. The jury shortly thereafter sent out two additional notes. One note asked for Charles' testimony and a copy of his written statement given at the police station. The other note stated, "We are split 1 to 11 no hope under this charge. Lesser charge???" The trial court observed that the jury had sent out three notes after only 90 minutes of deliberation, which included the time the jury was eating lunch. The trial court continued to question whether the jury was deliberating. The parties discussed an appropriate response and the court ultimately informed the jury that Charles' written statement was not in evidence and directed it to continue to deliberate. Two minutes later, the jury requested a transcript of defendant's videotaped statement and was informed it was not available. Three minutes later, the jury sent out a fifth note stating that it could not reach an agreement. Again, with the agreement of counsel, the trial court instructed the jury to continue deliberating. Forty-five minutes after that, the jury sent out two notes indicating that it "has a personal bias against the charge of 1st Degree [murder]," and that it was "Deadlocked." The trial court again noted the short time the jury had been deliberating and defense counsel requested the court issue an instruction set forth in *People v. Prim*, 53 Ill. 2d 62 (1972). The trial court agreed and so instructed the jury.

¶ 21	After the *Prim* instruction was issued, the jury deliberated for an additional 90 minutes before finding defendant guilty of first degree murder and that he personally discharged a firearm in the commission of the offense. Defense counsel filed a motion for a new trial, which was denied.

¶ 22	At the sentencing hearing on September 11, 2018, the trial court heard evidence in

aggravation and mitigation. The State presented victim impact statements from three of the victim's relatives and stressed the seriousness of the crime. In mitigation, the defense emphasized defendant's lack of criminal history, his strong family ties, the fact he graduated high school and was viewed as a positive role model for his peers. The defense also presented the live testimony of defendant's high school counselor and two statements from high school classmates. Defendant addressed the court in allocution. He expressed remorse for his involvement in the shooting but maintained he did not kill Bryant.

¶ 23    After considering all the factors in aggravation and mitigation, as well as reviewing the presentence investigation report, the trial court sentenced defendant to 20 years' imprisonment for first degree murder with a mandatory 20-year firearm enhancement, for a total sentence of 40 years' imprisonment. In rendering this sentence, the trial court expressed frustration that the minimum sentence it could impose was 40 years and believed such a sentence was excessive considering defendant's role in the offense, his background, and his potential for rehabilitation. The trial court even went so far as to research the law of the eighth amendment and the proportionate penalties clause of the Illinois Constitution to see if it had any discretion when sentencing defendant. After reviewing *Miller v. Alabama*, 567 U.S. 460 (2012), *People v. Harris*, 2016 IL App (1st) 141744, *People v. Thompson*, 2015 IL 118151, and *People v. House*, 2015 IL App (1st) 110580, the trial court concluded its hands were tied and, following our supreme court's words in *People v. Petrenko*, 237 Ill. 2d 490 (2010), stated that the judiciary is bound to fashion a sentence within the parameters set by the general assembly. Defendant thereafter filed a motion to reconsider sentence and, while arguing his sentence was excessive, did not raise any constitutional claims. The trial court denied the motion and this appeal followed.

¶ 24                                                     ANALYSIS

¶ 25     On appeal, defendant argues (1) the trial court committed reversible error in failing to

instruct the jury on the lesser included offense of aggravated discharge of a firearm, (2) the State

failed to establish the *corpus delicti* that he personally discharged a firearm, and (3) his 40-year

sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him.

We address each issue in turn.

¶ 26                                             Jury Instructions

¶ 27     Defendant argues the trial court improperly refused to instruct the jury on aggravated

discharge of a firearm as a lesser included offense of first degree murder.  The State agrees that

aggravated discharge of a firearm is a lesser included offense of first degree murder in this case

but maintains that the jury could not have rationally convicted him of that offense while

acquitting him of first degree murder and therefore the trial court did not err in refusing the

instruction.  For the reasons which follow, we agree with the State.

¶ 28     A defendant is entitled to a lesser included offense instruction only if the evidence at trial

is such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him

of the greater.  *People v. Medina*, 221 Ill. 2d 394, 405 (2006).  In Illinois, courts apply the

charging instrument approach when determining whether an offense qualifies as a lesser-

included offense.  *People v. Kennebrew*, 2013 IL 113998, ¶ 41.  Under this approach, "the lesser

offense need not be a 'necessary' part of the greater offense, but the facts alleged in the charging

instrument must contain a 'broad foundation' or 'main outline' of the lesser offense."  *Id.* ¶ 30.

The charging instrument approach requires a two-step analysis.  *Id.*  First, we determine whether

an offense is a lesser-included offense.  *Id.*  Then, we examine the evidence at trial to determine

"whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime

charged to a lesser offense." (Emphasis in original.) *People v. McDonald*, 2016 IL 118882,

¶ 25. Whether an offense is a lesser included offense of a charged crime is an issue of law that

we review *de novo*. *Kennebrew*, 2013 IL 113998, ¶ 18; *People v. Kolton*, 219 Ill. 2d 353, 361

(2006).

¶ 29    "[T]he second step—examining the evidence adduced at trial—should not be undertaken

unless and until it is first decided that the uncharged offense is a lesser-included offense of a

charged crime." *Kolton*, 219 Ill. 2d at 361. "When the trial court, after reviewing all the

evidence, determines that there is insufficient evidence to justify the giving of a jury instruction,

the proper standard of review of that decision is abuse of discretion." *McDonald*, 2016 IL

118882, ¶ 42. "Common sense dictates that, for a reviewing court to determine whether the trial

court abused its discretion, it must undertake a review of the relevant evidence. This is necessary

because an abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or

unreasonable to the degree that no reasonable person would agree with it." *Id.* ¶ 32.

¶ 30    We initially agree with the parties that aggravated discharge of a firearm is a lesser-

included offense of defendant's first degree murder charge. Here, the State proceeded to trial on

only first degree murder, which alleged that defendant:

> "WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY
>
> SHOT AND KILLED BRYANT JONES WHILE ARMED WITH A FIREARM, AND
>
> DURING THE COMMISSION OF THE OFFENSE HE PERSONALLY
>
> DISCHARGED A FIREARM[.]"

This charge essentially alleges that defendant intentionally or knowingly shot Bryant with a

firearm. It thus contains a "broad foundation" or "main outline" of the lesser offense of

aggravated discharge of a firearm, which occurs when a defendant intentionally or knowingly

"[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2(a)(2) (West 2012).

¶ 31 The next inquiry in our analysis is whether the evidence was sufficient to uphold a conviction of aggravated discharge of a firearm. *Kennebrew*, 2013 IL 113998, ¶ 30. "A defendant is entitled to a lesser included offense instruction only if the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him of the greater." *Medina*, 221 Ill. 2d at 405. This is an "evidentiary prerequisite [that] must be met before a right to have the jury instructed on a lesser-included offense arises." *Id.*

¶ 32 We find that defendant could not be rationally found guilty of aggravated discharge of a firearm yet not guilty of first degree murder. The State tried defendant in this case under a theory of accountability. A person is legally accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). Under the common design rule, "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *People v. Perez*, 189 Ill. 2d 254, 267 (2000). "Words of agreement are not necessary to establish a common purpose to commit a crime." *Id.* The common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). "Proof that defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of

the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability." *Id.*

¶ 33    In this case, we cannot say that the trial court abused its discretion when it determined that the jury could not have rationally convicted defendant of aggravated discharge of a firearm yet acquitted him of first degree murder. The evidence established defendant's guilt of first degree murder in this case. Defendant drove Cecil and Sebastian in his vehicle to Brandon Darty's apartment where the offense occurred. According to defendant's statement, he was aware that Cecil did not get along with Brandon and that a firearm was in his vehicle at the time they traveled to Brandon's apartment. Then, after the three left the apartment building, defendant drove away only to return a few minutes later. The evidence demonstrated that Cecil made a phone call during this time and had spoken to Brandon Darty indicating that he was going to fight him. After defendant parked the SUV next to the apartment building, Sebastian sat on the hood of the vehicle while defendant stood outside next to the driver's side. When Bryant and Shaundre began approaching the SUV, Sebastian slid off the hood and defendant pulled up his pants and approached Bryant in a manner that appeared to Shaundre and Carmen that defendant was preparing to fight. Cecil then reached into the vehicle, obtained the handgun, and fired at Bryant. Defendant informed the detectives that he then approached Cecil, took the weapon from him, and fired the weapon in Bryant's direction as Bryant ran away. The evidence demonstrates Shaundre and Carmen were running into the apartment building at this time and did not notice if defendant fired the weapon. Danyelle's testimony, however, indicated that she heard two gunshots followed by a pause and then more gunshots. This is consistent with defendant's account that he took the firearm from Cecil and then began shooting. While the medical examiner's evidence corroborates defendant's assertions to the detectives that he did not

strike Bryant, it does not negate his accountability in Bryant's murder.

¶ 34    Defendant nonetheless argues that there was a possibility that the jury could have convicted him of the lesser offense of aggravated discharge of a firearm based on the content of the notes sent to the court by the jury during its deliberation.  Specifically, defendant maintains that the jury expressly requested to be instructed on a lesser charge and therefore the jury could have reasonably determined he was not guilty of first degree murder based on the witnesses' testimony and guilty instead of aggravated discharge of a firearm.

¶ 35    We observe that defendant cites no case law supporting his proposition that the jury itself can determine whether it should have been provided with instructions on a lesser included offense.  Indeed, it is not the jury that makes that determination, but the trial court.  *McDonald*, 2016 IL 118882, ¶ 42.  As previously stated, the trial court's determination on which instructions to give is reviewed for an abuse of discretion.  *Id.*  Contrary to defendant's claim, the evidence established that defendant participated in a common criminal design where he not only drove Cecil to the apartment building, but also used the firearm, himself, to fire multiple shots in Bryant's direction as he fled.  A jury could not rationally find, under these circumstances, that defendant fired shots at Bryant, but was nevertheless not guilty of first degree murder under a theory of accountability.  We find that defendant was not entitled to a jury instruction on the lesser included offense of aggravated discharge of a firearm; and, consequently, the trial court did not err in refusing the instruction.  See *People v. Perez*, 108 Ill. 2d 70, 83 (1985) (finding the evidence underlying the accountability theory precluded any possibility of the jury finding the defendant guilty of aggravated battery and therefore the trial court did not err in refusing to give the defendant's tendered lesser included offense instruction).

¶ 36                                    *Corpus Delicti*

¶ 37    Defendant first asserts that the State failed to prove the *corpus delicti* of personally discharging a firearm thereby requiring the reversal of the finding that he personally discharged a firearm. According to defendant, the State failed to present any evidence corroborating defendant's admission that he fired the weapon. Defendant argues that because the *corpus delicti* cannot be proven by statements alone, the evidence is insufficient to support the jury's finding that he personally discharged a firearm.

¶ 38    When a defendant challenges the sufficiency of the evidence, the reviewing court must consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. Specifically, the State must prove two propositions beyond a reasonable doubt: (1) that a crime was committed, also known as the *corpus delicti*; and (2) that the defendant committed the crime. *People v. King*, 2020 IL 123926, ¶ 53; *People v. Underwood*, 2019 IL App (3d) 170623, ¶ 10. Importantly, a confession alone is insufficient to prove the *corpus delicti* of an offense; there must be some corroborating evidence tending to prove that a crime has been committed. *People v. Lara*, 2012 IL 112370, ¶¶ 17, 45. This corroborating evidence need only *tend* to show the commission of an offense and correspond with the circumstances related in the confession. *Id.* ¶ 32. It is not necessary that the independent evidence establish that the defendant committed a crime beyond a reasonable doubt. *Id.* In determining whether the State has met its burden, we will not substitute our judgment for that of the trier of fact, nor will we reverse a conviction unless the evidence is so improbable or unsatisfactory so as to raise reasonable doubt of a defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 39    The State argues that it is not required to prove every element of the offense of murder

under the *corpus delicti* rule, and that it is not required to later prove every element to the jury beyond a reasonable doubt. However, the personal discharge penalty is not an element of the offense of murder. See *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 47 ("personal discharge of a firearm is not an element needed to convict defendant of first degree murder."). The elements of first-degree murder are: (1) an intent to kill or do great bodily harm; and (2) "acts which cause[d] death." 720 ILCS 5/9-1(a) (West 2018). Our jury "instructions and the law of Illinois are clear that first degree murder and a personal discharge allegation contain separate elements." *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 77. The personal discharge penalty requires a separate finding by the jury, to be proved beyond a reasonable doubt. See *Alexander*, 2017 IL App (1st) 142170, ¶ 47 ("pursuant to *Apprendi*," personal discharge of a firearm is "a fact that needed to be submitted to the jury in order for the State to seek the firearm enhancement sentence") (citing *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000)).

¶ 40     Under the *corpus delicti* rule, as the parties agree, some proof is required beyond the statement or admission by the defendant to support a jury's beyond-a-reasonable-doubt finding. See *Lara*, 2012 IL 112370, ¶¶ 17, 45. In this case, there was no proof. The State asserts that the spent shell casings which were discovered in two different locations lends "some evidence" to support that defendant also fired the weapon. But this evidence is not sufficient where the State's expert testified that the placement of shell casings is not indicative of where an individual was standing when the weapon was fired. Indeed, the expert testified that shell casings can land many feet from where the weapon was fired. The location of the shell casings in conjunction with the trial testimony fails to provide sufficient corroborating evidence that *two* shooters were responsible.

¶ 41     The State further argues that the *corpus delicti* for murder and personal discharge of a

firearm is Bryant's dead body, with a gunshot wound. This, however, is not a case where the defendant is accused of personally causing any injury to the victim. This is a case where the State accuses defendant of firing a handgun only after the "acts which cause[d] the death." 720 ILCS 5/9-1(a) (West 2018). As a result, the body itself is not evidence of whether defendant did, or did not, personally discharge a firearm.

¶ 42    Moreover, we find defendant's argument that he did not fire the weapon during the commission of the murder persuasive. Defendant's admission to the detectives that he fired the weapon after the murder was completed may make him an accessory after the fact, but it does not establish that he fired a weapon during the commission of the murder. At trial, Shaundre testified that Ross fired a handgun at Bryant from three to five feet away, that the shot hit Bryant in his "left chest shoulder area," and that Shaundre observed that the force from the impact of the bullet caused Bryant to swing around. The medical examiner's testimony corroborated Shaundre's testimony that Ross murdered the victim with one shot. The examiner also testified that the autopsy revealed that one fatal gunshot, which entered Bryant's left-shoulder area, about three inches below his shoulder, went through Bryant's chest, and out his back. Importantly, no eyewitness testified they observed defendant holding or shooting a firearm.

¶ 43    This court has previously found that "[a]lthough driving the shooter away from a murder assists the shooter in avoiding capture, that conduct does not hold the driver legally accountable for the murder. [Citation.] That offense is accessory after the fact [citation], not first-degree murder." *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 148. Similarly, in the case at bar, the fact that defendant fired a weapon after the murder may render him guilty of being an accessory after the fact, but it does not make him guilty of personally discharging a weapon during the offense. The personal discharge statute provides that, "if, *during* the commission of

the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court." (Emphasis added). 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2018). We thus find that the State has failed to establish the *corpus delicti* required for application of the special finding of personal discharge of a firearm and vacate the 20-year mandatory sentence. See Ill. S. Ct. R. 615(b) (a reviewing court may "reduce the punishment imposed by the trial court.").

¶ 44                                            Sentence

¶ 45      Lastly, defendant argues that his 40-year sentence violates the proportionate penalties clause of the Illinois Constitution as applied where he was an "emerging adult" at only 19 years old at the time he committed the offense. Defendant claims that new scientific evidence concerning brain development in youths and the reasoning set forth in a line of caselaw beginning with the United States Supreme Court decision in *Miller*, which prohibits mandatory life sentences for juveniles who commit murder, should be considered, and applied to his specific circumstances as a 19-year-old young adult with no prior convictions. Accordingly, defendant requests we remand this case to the circuit court for a new sentencing hearing. In the alternative, defendant asserts his counsel was ineffective for failing to raise this issue at sentencing.

¶ 46      Based on our conclusion that the State failed to establish the *corpus delicti* required for a special finding of personal discharge of a firearm, we vacate defendant's 20-year sentence thereunder pursuant to Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) (a reviewing court may "enter any judgment and make any order *** and grant any relief *** that the case may require."). See also Ill. S. Ct. R. 615(b) (a reviewing court may "reduce the punishment imposed by the trial court.").

¶ 47      Thus, with defendant's 20-year enhancement vacated, we find his 20-year minimum

sentence for first-degree murder did not violate the proportionate penalties clause. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005) (citing *People v. Moss*, 206 Ill. 2d 503, 522 (2003)). We cannot say that defendant being sentenced to the minimum sentence shocks the moral sense of the community and defendant provides no argument otherwise. Thus, we affirm the circuit court's 20-year sentence for first-degree murder.

¶ 48                                        CONCLUSION

¶ 49     For the reasons stated above, the judgment of the circuit court of Cook County as to defendant's first-degree murder conviction is affirmed. We reverse the special finding that defendant personally discharged a firearm during the commission of the offense and thus vacate the corresponding 20-year sentence. We otherwise affirm defendant's 20-year minimum sentence for first-degree murder.

¶ 50     Affirmed in part; reversed in part; vacated in part.

¶ 51     PRESIDING JUSTICE GORDON, specially concurring:

¶ 52     I write separately to observe that our finding to vacate the personal-discharge penalty is also amply supported by the trial court's findings at sentencing.

¶ 53     At sentencing, the trial court made a specific finding that the 40-year sentence it was imposing was "excessive," in light of defendant's age, background and role in the offense. The 19-year-old defendant had no criminal history, no gang affiliation, no substance abuse issues and no school disciplinary records. At sentencing, the trial court found that it was codefendant Ross, not defendant, who "fired the fatal shot" that killed the victim. The trial court further found that defendant had "rehabilitative potential" and that "40 years is excessive when you consider what

he did here." The court observed that even "the jury sent out a note that said we have a moral dilemma with the first degree murder charge here." However, the court found that the statute left it no "discretion" and that it had to impose a 40-year sentence, served at 100%, because that was the mandatory minimum for first-degree murder with a personal-discharge penalty. In light of the trial court's already-existing finding of excessiveness in the case at bar, its imposition of the minimal possible sentence, its other factual findings concerning defendant's rehabilitative potential, and the jury's apparent frustration with the charges directed against defendant, I find no need to remand for resentencing after vacating the 20-year sentence for personal discharge. Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (a reviewing court may "enter any judgment and make any order *** and grant any relief *** that the case may require"); Ill. S. Ct. R. 615(b) (a reviewing court may "reduce the punishment imposed by the trial court").